JS-6

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

| | |
|---|---|
| **JONATHAN BOWDLE, on behalf of himself and all others similarly situated,**<br><br>**Plaintiff,**<br><br>v.<br><br>**KING'S SEAFOOD COMPANY, LLC,**<br><br>**Defendant.** | **Case No.: SACV 21-01784-CJC (JDEx)**<br><br>**ORDER GRANTING PLAINTIFF'S UNOPPOSED MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT [Dkts. 36–38] AND GRANTING PLAINTIFF'S MOTION FOR ATTORNEYS' FEES, EXPENSES, AND SERVICE AWARD TO PLAINTIFF [Dkt. 39]** |

## I.    INTRODUCTION

In this putative class action, Plaintiff Jonathan Bowdle alleges that Defendant King's Seafood Company, LLC, failed to properly secure and safeguard its current and former employees and customers' Personally Identifiable Information ("PII") and failed to timely notify them that their PII had been compromised.  (Dkt. 1 [Complaint].)  In

October 2022, the Court conditionally certified a class and preliminarily approved the parties' proposed settlement agreement (the "Settlement Agreement"), which provides $350,000 in available monetary relief for those that submit timely valid claims, two years of identity theft and credit monitoring services, and changes to Defendant's practices going forward.  (Dkt. 35 [hereinafter "Order"].)  The settlement administrator gave notice to the 2,958 class members.  (*See* Dkt. 38-1 at 22.)  The deadline to opt-out or object passed on December 21, 2022, and no one asked to be excluded from the settlement or objected.  (*Id.*)

Now before the Court is Plaintiff's unopposed motion for final approval of the Settlement Agreement, (Dkts. 36–38), and unopposed motion for attorneys' fees, expenses, and service award to Plaintiff, (Dkt. 39).  For the following reasons, both motions are **GRANTED**.

## II.    BACKGROUND

### A.    Factual Allegations and Procedural Background

Defendant is a restaurant chain that operates twenty-two restaurants throughout California, Arizona, and Nevada, collecting PII from employees and customers in the process. (Compl. ¶¶ 1, 3.)  Beginning on June 4, 2021, a hacker gained access to the directories where Defendant stored PII.  (*Id.* ¶¶ 4, 23, 25.)  Defendant learned of the breach on August 23, 2021, and sent affected employees and customers a notice of data breach on September 14, 2021.  (*Id.* ¶ 23.)  The notice explains that "[t]he information the unauthorized individual could have potentially accessed includes names, driver's license information, payment card information, medical cards, telephone numbers, and partially redacted Social Security numbers."  (*Id.*)

In this case, Plaintiff alleges that Defendant "did not use reasonable security procedures and practices appropriate to the nature of the sensitive information they were maintaining . . . such as encrypting the information or deleting it when it is no longer needed." (*Id.* ¶ 28.) He further alleges that he is now at an increased risk of identity theft and fraud. (*Id.* ¶¶ 66–68.) Plaintiff asserts claims for (1) negligence, (2) breach of implied contract, (3) invasion of privacy, (4) breach of confidence, (5) unjust enrichment, (6) violation of the Nevada Deceptive Trade Practices Act, and (7) violation of the Nevada Data Breach Law. (*Id.* ¶¶ 85–179.)

Defendant filed a motion to dismiss Plaintiff's Complaint on February 28, 2022. (*See* Dkt. 16.) The parties then spent multiple months "engag[ing] in numerous, arms-length, sometimes contentious, settlement negotiations," finally reaching an agreement on August 23, 2022. (Dkt. 38-1 at 3.)

### B. Proposed Settlement Terms

Under the Settlement Agreement, the class includes "all individuals residing in the United States to whom Defendant or its authorized representative sent a notice concerning the 2021 Data Security Incident announced by Defendant" and excludes "King's Seafood and King's Seafood's parents, subsidiaries, affiliates and any entity in which King's Seafood has a controlling interest" and "all judges assigned to hear any aspect of this Litigation as well as their immediate family members." (Dkt. 33-1 [Joint Declaration of Rachele R. Byrd and M. Anderson Berry, hereinafter "Joint Decl."] Ex. 1 [hereinafter "Settlement Agreement"] § I(1.6).) The Settlement Agreement has three primary categories: (1) identity theft protection and monitoring services, (2) monetary relief to those submitting valid claim forms, and (3) Defendant's business practice enhancements.

First, class members will be eligible for two years of free identity-theft protection and monitoring services. (*Id.* § II(2.1).) This benefit is available regardless of whether a Class Member is eligible for monetary recovery. (*Id.* § II(2.1.1).) Services provided include (1) credit monitoring at one of the three major credit reporting agencies, (2) dark web monitoring, (3) identity restoration and recovery services, and (4) $1,000,000 identity theft insurance with no deductible. (*Id.* § II(2.1).) The Executive Vice President at Pango Group—the company that will provide the services—testifies that these services are sold to consumers for $5 to $7 per month and that, using the lower amount, the value of providing Identity Defense Complete to 2,958 class members is $354,960.00. (Dkt. 38-1 at 7.)

Second, the Settlement Agreement provides that Defendant will make available $350,000 for monetary relief to be distributed to class members that submit a valid and timely Claim Form. (*Id.* § II(2.2.4).) Compensation for "ordinary losses" includes up to $450 per Class Member for expenses, fees, and/or lost time incurred as a direct result of the data breach. (*Id.* § II(2.2.1).) Class members must submit supporting documentation of any out-of-pocket expenses or fees. (*Id.*) They may also claim up to three hours of time spent dealing with the data breach, compensated at a rate of $20 per hour. (*Id.*) Compensation for "extraordinary losses" includes up to $3,000 per Class Member for monetary loss arising directly from documented identity theft that is fairly traceable to the data breach. (*Id.* § II(2.2.2).)

Third, for a period of 36 months beginning in July 2021, Defendant has and will continue to undertake certain reasonable steps to enhance the security deployed for its data network, including (1) periodic third-party security auditor and/or internal IT security personnel monitoring, scanning, and testing of data system security, with prompt correction of detected problems, (2) periodic internal IT security personnel training on data system security, (3) system segmentation, including firewalls and access controls,

(4) use of encrypted email, including encryption of email attachments, (5) routinely conducting employee training/education on best practices to avoid threats to data system, (6) having a breach response plan and training IT security personnel its operation, (7) implementing practices to ensure reasonable software lifecycle management, and (8) deploying active encryption software covering relevant data locations where PII maintained. (*Id.* § II(2.3).) Defendant's Chief Financial Officer estimates that in the first twelve months, the value of Defendant's changes is approximately $300,000, and that the value of continuing those enhancements for another 24 months is between $300,000 to $350,000, for a total value of $600,000 to $650,000. (Dkt. 38-1 at 8.)

The parties also negotiated Class Counsel's attorney fees and litigation expenses. They agreed that counsel will seek an award of $192,500 for fees and costs combined. (*Id.* § IX(9.2).) If the Court approves a lesser amount of attorney fees and expenses, Defendant will be responsible for paying only the approved amount. (*Id.*) Defendant also agreed to pay a service award of $1,750 to the class representative. (*Id.* § IX(9.1).)

In exchange for the consideration in the Settlement Agreement, Plaintiff and each Class Member shall be deemed to have fully, finally, and forever released, relinquished, and discharged all "Released Claims," including unknown claims. (*Id.* § VIII(8.1).) The "Released Claims" are those that were asserted or could have been asserted by any Class Member against Defendant and its related entities reasonably related to the operative facts alleged in or otherwise described by the Complaint. (*Id.* § I(1.23).)

C.   **Notice**

The settlement administrator, Atticus Administration LLC ("Atticus") mailed notice to 2,956 class members and emailed notice to two class members whose addresses were not available. (Dkt. 38-1 at 8.) It also created a settlement website and a toll-free

help line. (*Id.*) The deadline to object or opt-out was December 21, 2022. (*Id.* at 10.) No class member requested to opt out of the settlement or objected to the settlement. (*Id.*) On December 29, 2022, Atticus also sent a reminder of the settlement and the claims deadline by email to 1,633 class members who had not yet submitted claim forms and for whom email addresses were included in the class list. (*Id.* at 8–9.) "The reminder was not required by the Notice Plan but implemented to further supplement Class Member participation in and access to the settlement benefits." (*Id.* at 9.)

In total, the Claims Administrator received 251 claims. (Dkt. 47 [Supplemental Declaration of Bryn Bridley, hereinafter "Supp. Bridley Decl."] ¶ 5.) 96 of those claims were deemed valid—27 for free identity-theft protection only, 29 for lost time incurred only, and 41 for free identity-theft protection and lost time incurred. (*Id.* ¶ 9.)

### III. DISCUSSION

In deciding whether to grant the motion for final approval and the motion for attorney fees, the Court analyzes (1) whether to certify a class for purposes of settlement, (2) the fairness of the settlement, and (3) the class's response to the notice regarding the settlement agreement.

#### A. Class Certification

A plaintiff seeking class certification must satisfy two sets of requirements under Federal Rule of Civil Procedure 23: (1) Rule 23(a)'s requirements of numerosity, commonality, typicality, and adequacy, and (2) the requirement that the action fall within one of the three "types" of classes described in Rule 23(b)'s subsections. In this case, Plaintiff seeks certification under Rule 23(b)(3), which allows certification if a court "finds the questions of law or fact common to the members of the class predominate over

any questions affecting only individual members, and a class action is superior to other available methods for the fair and efficient adjudication of the controversy." Fed. R. Civ. P. 23(b)(3). The Court previously concluded that Plaintiff presented sufficient evidence to show that the proposed class satisfies the Rule 23(a) and (b)(3) requirements. (*See* Order at 6–11.) Having reviewed those requirements again, the Court adopts its prior analysis regarding class certification and grants certification of the proposed class for settlement purposes only. *See Atzin v. Anthem, Inc.*, 2022 WL 4238053, at *3 (C.D. Cal. Sept. 14, 2022) ("Nothing has changed to disturb that conclusion, and class certification remains appropriate.").

### B. Fairness of the Settlement

Although there is a "strong judicial policy that favors settlements, particularly where complex class action litigation is concerned," *Linney v. Cellular Alaska P'ship*, 151 F.3d 1234, 1238 (9th Cir. 1998), a settlement of class claims requires court approval. Fed. R. Civ. P. 23(e). This is because "[i]ncentives inhere in class-action settlement negotiations that can, unless checked through careful district court review of the resulting settlement, result in a decree in which the rights of class members, including the named plaintiffs, may not be given due regard by the negotiating parties." *Staton v. Boeing Co.*, 327 F.3d 938, 959 (9th Cir. 2003) (cleaned up).

Approval of class action settlements is governed by Federal Rule of Civil Procedure 23(e). A district court may approve class action settlements only when they are "fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(2). Courts must consider whether (A) the class representatives and class counsel have adequately represented the class, (B) the proposal was negotiated at arm's length, (C) the relief provided for the class is adequate, and (D) the proposal treats class members equitably relative to each other. *Id.* 23(e)(2)(A–D).

### 1. Adequacy of Class Representatives and Counsel

The class representatives and class counsel have ably represented the class to date. Indeed, they managed to reach a significant settlement even after Defendant filed a motion to dismiss Plaintiff's complaint. (*See* Dkt. 16.) There is also no evidence of a conflict of interest between Plaintiff and the class. Plaintiff's claims are identical to those of the class, and he has every incentive to vigorously pursue those claims. Nor is there any evidence that Plaintiff's counsel will not adequately represent or protect the interests of the class. As stated in the Court's preliminary approval order, Plaintiff's attorneys—Wolf Haldenstein Adler Freeman & Herz LLP and Clayeo C. Arnold, a Professional Law Corporation—have extensive experience litigating class action and data breach cases. (Order at 8–9.) And as discussed, the record indicates that counsel have represented the class capably and adequately.

### 2. Arm's Length Negotiation

As discussed in more detail later in this order, the Court has found no evidence of collusion during the parties' settlement negotiations. The Settlement Agreement is the product of months of negotiations between experienced counsel that thoroughly investigated and meaningfully began to litigate the viability of Plaintiff's claims, including when Defendant filed a motion to dismiss. The Court is satisfied that the negotiation of the Settlement Agreement was conducted at arm's length.

### 3. Adequacy of Relief for the Class

In determining whether the class's relief is "adequate," courts consider "(i) the costs, risks, and delay of trial and appeal; (ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims;

(iii) the terms of any proposed award of attorney's fees, including timing of payment; and (iv) any agreement required to be identified under Rule 23(e)(3)." *Id.* 23(e)(2)(C).[1] The Court finds the proposed relief to be adequate.

### a.     Costs, Risks, and Delay of Trial and Appeal

The Settlement Agreement reflects a substantial outcome for the thousands of people affected by Defendant's data breach, with class members who submit valid claim forms able to recover any documented losses, plus two years of credit monitoring and identity theft insurance services, not to mention the significant changes to security practices Defendant has and will continue to implement. *See Gaston v. FabFitFun, Inc.*, 2021 WL 6496734, at *2 (C.D. Cal. Dec. 9, 2021) ("Improved data security will benefit those class members whose information remains in Defendant's possession and protect future customers."). Indeed, courts have approved similar settlements in data breach cases, and privacy class actions regularly settle for primarily non-monetary relief. *See, e.g., Hashemi v. Bosley, Inc.*, 2022 WL 18278431, at *5 (C.D. Cal. Nov. 21, 2022) (granting final approval in data breach case with $500,000 made available for over 100,000 class members with similar ordinary and extraordinary expense reimbursement structure); *Campbell v. Facebook Inc.*, 2017 WL 3581179, at *8 (N.D. Cal. Aug. 18, 2017) (granting final approval of settlement providing for declaratory and injunctive relief in litigation alleging Facebook engaged in user privacy violations), *aff'd,* 951 F.3d 1106 (9th Cir. 2020); *In re Google LLC St. View Elec. Commc'ns Litig.*, 2020 WL

---

[1] Before Congress codified these factors in 2018, the Ninth Circuit instructed district courts to apply the following factors in determining whether a settlement agreement was fair, reasonable, and accurate: "[1] the strength of plaintiffs' case; [2] the risk, expense, complexity, and likely duration of further litigation; [3] the risk of maintaining class action status throughout the trial; [4] the amount offered in settlement; [5] the extent of discovery completed, and the stage of the proceedings; [6] the experience and views of counsel; [7] the presence of a governmental participant; and [8] the reaction of the class members to the proposed settlement." *Roes, 1-2 v. SFBSC Mgmt., LLC*, 944 F.3d 1035, 1048 (9th Cir. 2019); *Staton v. Boeing Co.*, 327 F.3d 938, 959 (9th Cir. 2003). The Court still considers these factors to the extent that they shed light on the inquiry mandated by Rule 23(e).

1288377, at *16 (N.D. Cal. Mar. 18, 2020) (granting final approval of settlement providing injunctive relief and creating a non-distributable *cy pres* settlement fund in litigation alleging Google violated privacy by illegally gathering Wi-Fi network data).

The benefits class members will receive present a fair compromise given the costs, risks, and delay of trial and appeal.  Litigation in this case had reached a stage in which the parties had a clear view of the strengths and weaknesses of their positions.  Defendant had filed a motion to dismiss Plaintiff's Complaint, the parties had the benefit of some informal discovery, and Plaintiff submitted a public records request to the Commonwealth of Massachusetts for additional information.  (Dkt. 38-1 at 21); *Hashemi*, 2022 WL 18278431, at *5 ("Here, the parties admit that no formal discovery took place, but they did conduct informal pre-mediation discovery which generally supports final approval.").  With that information, the parties were able to realistically value the scope of Defendant's potential liability and assess the costs, risks, and delay of moving forward with discovery, class certification, other motion practice, and trial.  *See In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454, 459 (9th Cir. 2000) (explaining that approving a settlement is favored when the "parties have sufficient information to make an informed decision about settlement" (cleaned up)).

Those costs and risks are not insignificant.  This case has involved very few litigation costs so far, and the additional costs involved to bring this case to trial would be substantial.  Extensive and expensive discovery and expert analysis would be required for class certification and trial.  There are also significant costs and risks associated with class certification, summary judgment, and trial, especially in this data breach case when tying Plaintiff's alleged injuries to this particular data breach may be difficult.  *See In re Portal Software, Inc. Sec. Litig.*, 2007 WL 4171201, at *3 (N.D. Cal. 2007) ("Additional consideration of increased expenses of fact and expert discovery and the inherent risks of proceeding to summary judgment, trial and appeal also support the settlement.");

*Hashemi*, 2022 WL 2155117, at *7 (explaining that "data breach class actions are a relatively new type of litigation and that damages methodologies in data breach cases are largely untested and have yet to be presented to a jury"); *Gaston*, 2021 WL 6496734, at *3 ("Historically, data breach cases have experienced minimal success in moving for class certification."); (Dkt. 38-1 at 18 [collecting cases]).  Even if Plaintiff could secure a better result than the Settlement Agreement represents at trial, any result obtained after additional litigation or trial would take significantly longer and there is a risk that Plaintiff could receive much less, or nothing at all.  *See In re Omnivision Techs., Inc.*, 559 F. Supp. 2d 1036, 1041–42 (N.D. Cal. 2008) (discussing how a class action settlement offered an "immediate and certain award" in light of significant obstacles posed through continued litigation).

### b.  Effectiveness of Proposed Method of Distributing Relief to The Class

Next, the Court must consider "the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims." Fed. R. Civ. P. 23(e)(2)(C).  "Often it will be important for the court to scrutinize the method of claims processing to ensure that it facilitates filing legitimate claims." Fed. R. Civ. P. 23 advisory committee's note to 2018 amendment.  "A claims processing method should deter or defeat unjustified claims, but the court should be alert to whether the claims process is unduly demanding." *Id.*

Here, the relief distribution is straightforward.  Class members were able to easily complete and submit a claim form for credit monitoring and identity theft insurance services, plus out-of-pocket costs and compensation for time spent addressing the data breach.  And they were able to mail the claim form attached to the notice they received in

the mail or submit a claim form online.  (*See* Settlement Agreement § II(2.2.3).)  This procedure for filing claims was not unduly demanding.

It does give the Court pause that of 251 claims received, only 96 were valid. (Supp. Bridley Decl. ¶ 8.)  However, 129 of the claims were invalid because the people who submitted the claims were not included in the Settlement Class.  (*Id.* ¶ 10.)  This indicates to the Court that it was not an unduly burdensome claims process that prevented valid claims from being filed.  Moreover, the fact that 47 people who submitted deficient claims were given a chance to cure the deficiencies, and two people did, confirms the reasonableness of the claims procedure.  (*Id.* ¶ 7.)  Further, Atticus sent a reminder email to those class members who had not yet submitted claim forms and for whom email addresses were included in the class list.  (Dkt. 38-1 at 8–9.)  This affirms the parties' commitment to increasing claims, not frustrating them.

### c. Attorney Fees and Costs

Next, the Court must consider "the terms of any proposed award of attorneys' fees, including timing of payment," in determining whether the class's relief is adequate.  Fed. R. Civ. P. 23(e)(2)(c).  When reviewing attorney fees requests in class action settlements, courts have discretion to apply the percentage-of-the-fund method or the lodestar method to determine reasonable attorney fees.  *See Powers v. Eichen*, 229 F.3d 1249, 1256 (9th Cir. 2000); *In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935, 944–45 (9th Cir. 2011).  In considering the proposed award of attorney fees, the Court must also scrutinize the Settlement Agreement for three factors that tend to show collusion: (1) when counsel receives a disproportionate distribution of the settlement, (2) when the parties negotiate a "clear sailing arrangement," under which the defendant agrees not to challenge a request for agreed-upon attorney fees, and (3) when the agreement contains a "kicker" or

"reverter" clause that returns unawarded fees to the defendant, rather than the class. *Briseno v. ConAgra Foods, Inc.*, 998 F.3d 1014, 1022 (9th Cir. 2021).

Beginning with the markers of collusion, the Settlement Agreement does not contain a clear sailing agreement. However, it does contain the functional equivalent of a reverter clause. A reverter clause is one "in which [the defendant], not the class members, receives the remaining funds if the court reduces the agreed-upon attorneys' fees." *Id.* at 1027. Under the Settlement Agreement, Plaintiff agrees to seek an award of $192,500, but if the Court approves a lesser amount, Defendant is only obligated to pay the lesser amount, meaning that any reduction in fees stays in Defendant's pocket rather than benefitting the class. (SA § IX(9.2).)

The reverter clause in the Settlement Agreement, however, does not give rise to collusion concerns. *See Shames v. Hertz Corp.*, 2012 WL 5392159, at *14 (S.D. Cal. Nov. 5, 2012) ("[B]ecause the attorneys' fees in this case are wholly separate from the class settlement—and will have no impact one way or the other on the amount the class recovers—a 'savings' for Defendants does not implicate the concerns the Ninth Circuit expressed about the 'kicker' provision in the *Bluetooth* settlement."). That is because many of the class members in this case likely suffered no financial injury at all, but rather only the risk of future financial injury. *See Hashemi*, 2022 WL 18278431, at *7 (making same observation in data breach case). And the Settlement Agreement already provides for those that did suffer financial injury to get reimbursed for their time and their losses. Distributing unawarded fees to class members "would result in many Class Members receiving a windfall for injuries they never suffered—and thus lack standing to prosecute." *Id.*

The final factor that tends to show collusion is when counsel receives a disproportionate distribution of the settlement. Plaintiff asks the Court to award

Case 8:21-cv-01784-CJC-JDE   Document 49   Filed 02/13/23   Page 14 of 19   Page ID #:974

$192,500 in attorney fees and expenses combined.  The Ninth Circuit has held that 25% of a settlement fund is the "benchmark" for a reasonable fee award, and courts must provide adequate explanation in the record of any "special circumstances" to justify a departure from this benchmark.  *Bluetooth*, 654 F.3d at 942–43; *Paul, Johnson, Alston & Hunt v. Graulty*, 886 F.2d 268, 272 (9th Cir. 1989) ("We note with approval that one court has concluded that the 'bench mark' percentage for the fee award should be 25 percent.  That percentage amount can then be adjusted upward or downward to account for any unusual circumstances involved in this case." (citation omitted)).

Plaintiff contends that the settlement here is worth $1,269,810, counting the $350,000 in funds made available for losses and lost time, $192,500 in attorney fees and costs, $22,350 in notice and administration expenses, $354,960 for the value of credit monitoring and identity protection insurance services, and $350,000 for the value of the remedial measures Defendant has and will continue taking.  If the settlement is valued at $1,269,810, the $192,500 fee request would comprise about 15% of the common fund and would favor approval.  *See, e.g., Gaston*, 2021 WL 6496734, at *3 (approving data breach settlement when fee request was "within the 25% benchmark considered reasonable").

The Court must look closely at the value of the Settlement Agreement to ensure that there are no signs that the fees counsel requests are unreasonably high, examining in particular the relationship between fees requested and the benefit to the class.  And the Court is not persuaded that Plaintiff's $1,269,810 valuation of the settlement is appropriate.  For example, the $192,500 in fees and $22,350 in notice and administration expenses included in Plaintiff's valuation are not benefits to the class.  Moreover, Defendant's Chief Financial Officer does not provide any support or explanation for his estimate of the value of Defendant's 36-month "System Enhancements."  (*See* Dkt. 39-6 [Declaration of Richard Fiore].)  Additionally, the estimated value of the credit

-14-

monitoring services is based on *every* class member claiming those services—an unreasonable assumption. *Cf. Briseno*, 998 F.3d at 1026 ("So little goes to the class members in a claims-made settlement, such as this one, because the redemption rate is notoriously low, especially when it involves small-ticket items."). For these reasons, the Court has concerns that the parties' estimate of the value of the settlement is inflated. However, even applying a substantial reduction to Plaintiff's valuation, counsel's fee request still constitutes less than the 25% benchmark. The fees requested therefore appear reasonable.

Courts commonly perform a lodestar cross-check to assess the reasonableness of the percentage award. *See Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1050 (9th Cir. 2002) ("Calculation of the lodestar, which measures the lawyer's investment of time in the litigation, provides a check on the reasonableness of the percentage award."); *Bluetooth*, 654 F.3d at 943 (encouraging a "comparison between the lodestar amount and a reasonable percentage award"). Plaintiff's counsel contend their lodestar fee is $210,618 because they spent 366 hours at reasonable hourly rates between $205 and $800. (Dkt. 39-1 at 2; Dkt. 45 [redacted billing records].) The Court has reviewed the detailed billing records provided (Dkt. 45) and concludes that the lodestar amount fairly compensates the attorneys in this case, given the good result they efficiently achieved for the class, the able representation of counsel, and the work reflected in the billing records. *See In re Coordinated Pretrial Proceedings in Petroleum Prod. Antitrust Litig.*, 109 F.3d 602, 607 (9th Cir. 1997) (explaining that comparing the lodestar fee to the 25% benchmark "resembles what lawyers commonly do when they draft a bill based on hours spent, consider the bottom line as compared with the value of the result, then cut the bill if the total seems excessive as compared with the results obtained"). Counsel's lodestar, which appears reasonable and is higher than the requested fees, therefore confirms the reasonableness of the fees sought.

In addition to the amount of counsel's fees and costs, the Court must scrutinize the timing of payment. Fed. R. Civ. P. 23(e)(2)(c). The Settlement Agreement provides that the Settlement Administrator must pay Class Counsel no later than fourteen days after the Effective Date. (*See* Settlement Agreement § IX(9.3).) That date is well in advance of when class members can expect to be compensated. (*See id.* § X(10.2) [providing that electronic payments will be issued within 60 days of the Effective Date, or within 30 days of the date the claim is approved, whichever is later].) This could cast a slight shadow on the proposed fee and cost arrangements. *See, e.g.*, *Salas Razo v. AT&T Mobility Servs., LLC*, 2022 WL 4586229, at *13 (E.D. Cal. Sept. 29, 2022) ("[C]ounsel will receive payment at the same time as class members, and the timing of payment does not weigh against preliminary approval of the Class Settlement."). However, to address this concern, counsel has agreed to "refrain from receiving any court-approved attorneys' fees until the Settlement Administrator begins disseminating cash payments to the Settlement Class." (Dkt. 39-1 at 23.) This assuages any concerns regarding the appearance of collusion.

### d. Any Agreement Required to Be Identified Under Rule 23(e)(3)

The Court must also consider whether there is "any agreement required to be identified under Rule 23(e)(3)," Fed. R. Civ. P. 23(e)(2)(C)(iv)—that is, "any agreement made in connection with the proposal," *id.* 23(e)(3). The parties have identified no agreement other than the proposed Settlement Agreement.

### e. Incentive Award

Finally, Plaintiff requests a $1,750 incentive award. Incentive awards are payments to class representatives for their service to the class in bringing the lawsuit. *See*

*Radcliffe v. Experian Info. Sols. Inc.*, 715 F.3d 1157, 1163 (9th Cir. 2013). Such awards "are fairly typical in class action cases" and are discretionary. *Rodriguez v. W. Pub. Corp.*, 563 F.3d 948, 958 (9th Cir. 2009). In the Ninth Circuit, a $5,000 incentive award is "presumptively reasonable." *Bellinghausen v. Tractor Supply Co.*, 306 F.R.D. 245, 266 (N.D. Cal. 2015); *see also Harris v. Vector Marketing Corp.*, 2012 WL 381202, at *7 (N.D. Cal. Feb. 6, 2012) (collecting cases and explaining that in the Ninth Circuit, $5,000 is a presumptively reasonable service award). Plaintiff asserts that a $1,750 award will compensate him for his work "(1) meeting with Class Counsel at the outset of the case; (2) assisting with investigation of the facts; (3) reviewing the complaint prior to filing; and (4) consulting with Class Counsel during the litigation and settlement negotiations." (Dkt. 39-1 at 24.) Plaintiff's requested incentive award appears reasonable given the work he performed on this case. *See Gaston*, 2021 WL 6496734, at *4 (awarding $5,000 for each of two named representatives in data breach case); *Pfeiffer v. RadNet, Inc.*, 2022 WL 2189533, at *4 (C.D. Cal. Feb. 15, 2022) (approving a service award of $1,500 for each of seven representative plaintiffs). Accordingly, the Court approves the requested $1,750 incentive award.

### 4.   Equitable Class Member Treatment

The final Rule 23(e) factor turns on whether the proposed settlement "treats class members equitably relative to each other." Fed. R. Civ. P. 23(e)(2). "Matters of concern could include whether the apportionment of relief among class members takes appropriate account of differences among their claims, and whether the scope of the release may affect class members in different ways that bear on the apportionment of relief." Fed. R. Civ. P. 23 advisory committee's note to 2018 amendment.

Under the Settlement Agreement, class members may receive differing payouts depending on what documentation they have of their out-of-pocket costs and the time

they spent responding to the data breach.  This difference in treatment is appropriate and reasonable.  The release is also the same for all class members.  The Court finds that the Settlement Agreement treats class members equitably.

C.  **Response to Notice**

As explained, Atticus mailed or emailed notice of the proposed settlement to all 2,958 class members.  (Dkt. 39-5 [Declaration of Bryn Bridley, hereinafter "Bridley Decl."] ¶¶ 6, 8.)  It also established and maintained a settlement website and a toll-free information line, which received 14 calls.  (*Id.* ¶¶ 8–9.)  Atticus received 251 claim forms requesting recovery from the settlement fund, and deemed 96 of those to be valid claims.  (Supp. Bridely Decl. ¶ 8.)  This amounts to an approximately 3.2% claims rate.

No class members opted out or objected to the settlement.  (Bridley Decl. ¶ 10.)  This indicates overall support for the Settlement Agreement and supports final approval.  *See, e.g.*, *Hashemi*, 2022 WL 18278431, at *6 ("Very few objections and opt-outs create a strong presumption that the Settlement is beneficial to the Class and thus warrants final approval."); *In re Lifelock, Inc. Mktg. & Sales Practices Litig.*, 2010 WL 3715138, at *6 (D. Ariz. Aug. 31, 2010) (explaining that low number of timely written objections and requests for exclusion supported settlement approval); *National Rural Telecommunications Cooperative v. DIRECTV, Inc.*, 221 F.R.D. 523, 529 (C.D. Cal. 2004) ("The absence of a single objection to the Proposed Settlement provides further support for final approval of the Proposed Settlement.  It is established that the absence of a large number of objections to a proposed class action settlement raises a strong presumption that the terms of a proposed class settlement action are favorable to the class members.").

## IV. CONCLUSION

For the foregoing reasons, Plaintiff's motions for final approval of the Settlement Agreement and for attorney fees and costs are **GRANTED**.

DATED: February 13, 2023

CORMAC J. CARNEY

UNITED STATES DISTRICT JUDGE